LYMAN MFG. CO. v. BASSICK MFG. CO., and six other cases.

(Circuit Court of Appeals, Sixth Circuit. March 23, 1927.)

(Nos. 4461–4464, 4571, 4572, 4601, 4611, 4612, 4766).

1. Patents ⬅➡328—Reissue, 14,667, for lubricating system for automobiles, held not infringed as to claim 6, and valid and infringed as to claim 12.

Winkley reissue patent, No. 14,667, for a lubricating system for metal bearings, particularly those of automobiles, held not infringed as to claim 6, and valid and infringed as to claim 12.

2. Patents ⬅➡26(1)—Modification of one element by another during one of successive steps of unitary operation is sufficient to make combination, as distinguished from mere aggregation.

It is not necessary that the mutual interaction of elements should be constant to make a patentable combination instead of mere aggregation, but modification of one element by another during one of the successful steps of the unitary operation is sufficient.

3. Patents ⬅➡328—1,307,734, for lubricating means for automobiles, held valid as to claims 1-4, 7, 8, 14, 15, and invalid as to claim 12.

Gullborg patent, No. 1,307,734, for lubricating means for automobiles, held valid as to claims 1-4, 7, 8, 14, 15, and invalid as to claim 12.

4. Patents ⬅➡328—1,459,662, for automobile lubricating system, held invalid for lack of invention.

Manzel patent, No. 1,459,662 for lubricating system, particularly for automobiles, held invalid for lack of invention.

5. Patents ⬅➡210—That patentees sanction use of invention on parts of automobile does not give owner license to use invention on other parts.

Because patentees of lubricating system for automobiles have sanctioned use of invention on a certain number of bearings on an automobile by furnishing the means therefor, owner of automobile does not have license to get same means from some other source for use of invention on other and additional bearings.

**6. Patents ⚖══212(2)—Others than licensed users may keep part of patented combination in stock for sale to licensed users.**

If a patented combination, which includes a normally and frequently removable element is in general use, others than licensed users may keep this part in stock for sale to licensed users.

**7. Patents ⚖══259(2)—Sale to dealers of unpatented parts suitable and intended for use in patented lubricating system held "contributory infringement."**

Sale to garage keepers and dealers of parts suitable and intended for eventual use as part of patented lubricating system *held* to constitute contributory infringement, though part itself was unpatented.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contributory Infringement.]

**8. Patents ⚖══301(1)—That contributory infringement is trifling does not justify refusal of injunction.**

That contributory infringement of patent is trifling may be good ground for denying accounting, but it does not justify refusal of injunction.

**9. Patents ⚖══311—Defense to charge of contributory infringement that owner of patent caused confusion by not marking patented goods is in effect claim of license and must be proved.**

Defense to charge of contributory infringement by sale of unpatented parts for patented combination that owner of patent caused confusion by not marking patented goods is in effect claim of license, which must be pleaded, and burden of proving which is on defendants.

Appeals and Cross-Appeals from the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Appeals and Cross-Appeals from the District Court of the United States for the Western Division of the Southern District of Ohio; Smith Hickenlooper, Judge.

Separate patent infringement suits by the Bassick Manufacturing Company against the Lyman Manufacturing Company and others, against the Peerless Automatic Machine Company, against the O. K. Manufacturing Company and others, against the Larkin Automotive Parts Company, against the Wag's Auto Accessories Company, and against the Riggs Tire & Supply Company. From the decrees in the first three cases, all parties appeal; and plaintiff alone appeals in the other cases. Decrees respectively reversed or modified in accordance with opinion, and remanded, with directions.

Lynn A. Williams, of Chicago, Ill., and John Weld Peck, of Cincinnati, Ohio (Williams, Bradbury, McCaleb & Hinkle, of Chicago, Ill., Squire, Sanders & Dempsey, of Cleveland, Ohio, and Albin C. Ahlberg, of Chicago, Ill., on the briefs), for Bassick Co.

Arthur J. Hudson, of Cleveland, Ohio (G. E. Dunstan, of Cleveland, Ohio, on the briefs), for Lyman Co. and Peerless Co.

Allen & Allen, of Cincinnati, Ohio, amici curiæ.

Alfred M. Allen, of Cincinnati, Ohio (Marston Allen, of Cincinnati, Ohio, Frank W. Krehbiel, of Dayton, Ohio, Howard C. Williamson, and Allen & Allen, all of Cincinnati, Ohio, on the briefs), for O. K. Co.

Edward L. Reed, of Dayton, Ohio, and Alfred M. Allen, of Cincinnati, Ohio (Allen & Allen, of Cincinnati, Ohio, and E. H. & W. B. Turner, of Dayton, Ohio, on the brief), for Larkin Co.

In 4461–4464:

Before DENISON, DONAHUE, and MOORMAN, Circuit Judges.

In 4571, 4572, 4601, 4611, 4612, 4766:

Before DENISON and MOORMAN, Circuit Judges, and TUTTLE, District Judge.

DENISON, Circuit Judge. These cases can best be considered by one opinion, all the judges in each case concurring. They are patent cases, affecting the lubrication of metal bearings, and particularly those of automobiles. The universality of the automobile has made this a problem with which thousands must be somewhat familiar, where formerly only here and there a few of those engaged in mechanical pursuits were concerned. This change in the size of the community affected does not change the inherent character of the problem, but gives a different color, perhaps to a substantial extent, to the questions of utility involved.[1] From the beginning of the automobile use until about 1917, lubrication at the points where heavy oil or grease was the proper medium had been effected mostly through the so-called grease cup. The conduit leading to the point of final lubrication was, at its beginning at the outer and accessible location, enlarged into a screw-threaded opening. The grease cup was turned into this and might remain permanently attached. This grease cup was closed by a removable cap; the interior being filled with grease, the cap or a plunger contained in the cup was turned down, whereby the grease was driven through the conduit to the bearing. It was also common, where the outer opening was in a relatively inaccessible spot or where large

---

[1] See Jackson Co. v. Peerless Co. (C. C. A. 6), 228 F. 691, 694.

amounts of grease were to be used, to close the opening with a removable cap, and upon the removal of that cap, or when desired upon the removal of the grease cup, what was called a grease gun was employed. This was a cylinder in which a plunger was forced along driving the grease out of the cylinder and grease gun through a coupling, often flexible, the end of the coupling being screwed into the threaded opening which led to the point of lubrication.

It is obvious, and was a matter of common observation, that these methods of lubricating were very greasy and dirty. Even if the work was not done in a garage, grease was likely to be left smeared about, where it would come in contact with the clothes of the user, and the vast number of men and women who must do this work themselves were forced to put on old clothes and gloves every time some greasing was necessary, even on the road, or else suffer damage; also the old grease commonly became dirty and hardened on the bearing or in the conduit and very difficult to remove by any simple available means. Thus there was undoubtedly a great and growing demand for many years for some method or device for this kind of lubrication, which would be efficient and cleanly and so simple that it could be used by the ordinary run of car owners anywhere and at any time.

It is this demand which, in a commercial way, was first met and seems to have been, at least for the time being, fully satisfied by the device and plan known under the trade name of the Alemite high pressure system. By this system all the grease cups were removed and in their places were put devices, which contained little or no grease reservoir, but merely extended the conduit above the surface of the main member. They were identical in size and form, so that each one was just like any other, no matter in what part of the machinery it was found. They will be more particularly described hereafter, but in the most used form, each one carries a pin driven transversely through it and projecting at each side into the open. Hence they have taken, in this trade and in this litigation, the name of pin fitting. In connection with them there was supplied a device of general similarity to the old grease gun, but with changes adapted to make it peculiarly appropriate for this connection. It was provided at its nozzle with slots for engaging with the arms of the pin fittings to make a union of the bayonet joint type.[2] Special

constructions to be described tended to prevent the extrusion of excess grease. The hose of the compressor could therefore be attached, by effective and grease-tight joints, instantly to any fitting anywhere, no matter how relatively inaccessible, the grease forced into the bearing even if a very high pressure was necessary, and the coupler could be instantly removed and attached to the next fitting.

No doubt the system was quick, efficient, and cleanly, far beyond anything in commercial use. It was probably first manufactured in 1916. In 1917 one of the strong automobile companies adopted it as standard equipment, by which is meant that when the automobile leaves the factory, all its greasing points are provided with these fittings instead of the old grease cups, and the compressor and coupler go along as part of the tool equipment. The system proved so acceptable to the public that in 1923 it had been adopted as standard equipment by 85 per cent. (in number) of the automobile manufacturers in the country; but several of the largest manufacturers had not so accepted it. Hence all the older machines still in use, and all those being put out by these larger manufacturers, were still provided with the old grease cups or with threaded openings in which either grease cups or the Alemite fittings could be inserted, and these automobiles continued to furnish a general market for which the Alemite system could be sold. There was use also in other machinery. The total amount of sales has been and continues to be very large.[3] The question involved in this litigation is, to how much patent protection, if any, the proprietors of this business are entitled.

The patents upon which whatever rights

---

[2] For convenience, we hereafter refer to the protruding receiving member, in all construc-

tions as the "fitting," and to every form of the nozzle as the "coupler." We also assume that the coupler is always attached from above.

[3] After the introductory period the sales were, in numbers:

| Year. | Couplers. | Fittings. |
|---|---|---|
| 1919 | 170,000 | 5,737,055 |
| 1920 | 498,000 | 16,750,611 |
| 1921 | 438,943 | 14,780,470 |
| 1922 | 979,766 | 31,444,216 |
| 1923 | 1,460,233 | 43,520,864 |
| | 3,546,942 | 112,233,216 |

In money:

| Year. | Amount. |
|---|---|
| 1919 | $ 707,350.00 |
| 1920 | 1,263,050.00 |
| 1921 | 1,815,702.00 |
| 1922 | 3,474,572.00 |
| 1923 | 4,141,790.00 |

Defendants Lyman and O. K. Company began to put out the alleged infringements about 1922.

they have are based, and so far as involved in any of these appeals, are Winkley reissue 14,667, dated June 10, 1919, and reaching back to the original application of May 1, 1916, for a "lubricating system"; Gullborg, for "lubricating means," No. 1,307,734, issued to him June 24, 1919, upon an application filed December 21, 1918; and Manzel, for "lubricating system," numbered 1,459,-662, dated June 19, 1923, upon an application filed August 18, 1920.

Winkley contemplates using a fluid lubricant rather than a heavy grease; but, as these are only other terms for light and heavy oils, the patent is not necessarily for that reason inapplicable. Winkley provided a compressor with a movable piston, which forced oil under pressure into a discharging flexible hose, which carried it to the coupler for passing on into the fitting. This coupler comprised primarily an external casing cylinder or barrel with a central bottom orifice, and, sliding vertically within the barrel, a secondary cylinder (which Winkley called a cup) having a central orifice in its hopper bottom adapted to project downward through the orifice in the barrel. The top of this interior cylinder was closed and its vertical motion was controlled by a spring interposed between the cup top and the barrel top whereby normally the cup would be forced downwardly, so that its hopper bottom would project, but would remain capable of a substantial, though limited, upward motion against the spring.

The oil-carrying flexible hose was connected to a circular opening through the side wall of the barrel, and at this point there was a slotted vertical opening through the cup well, whereby the passage of the oil from the hose to the cup would continue in spite of the cup's vertical motion in the casing. The center orifice in the bottom of the cup was normally closed by a check valve, the upward stem of which was surrounded by an actuating spring, carried up to the under side of the cup cover; but the lower part of this check valve was carried on downwardly and when the valve was closed projected through and below the opening in the cup bottom. This coupler casing was also provided with downwardly projected and horizontally diverging claws, which were adapted to pass under appropriate shoulders in the head of the fitting below. The parts were so proportioned that when the two were thus clamped together, the head of the fitting would contact with and press upwardly the downwardly projecting valve stem, thus opening the check valve in the cup. This

initial upward motion would be limited and stopped when the top of the fitting and the projecting bottom of the cup came together; but inaccuracies in the sizes and the slight irregularities of manufacture or of wear would be met, and the efficiency of the seal promoted, by the further upward motion of the cup in its recession against its spring resistance. Pressure applied to the oil column would then open the spring check valve in the fitting and the oil would flow through the lower conduit to the bearing. There was, therefore, at the joint between the two parts, the primary seal effected by the gripping, but unadjustable, contact of the claws and shoulders and the secondary reinforcing contact effected by the spring-pressed resistance of the sliding cup.

[1] In the Lyman case, claims 6 and 12 of Winkley are in issue. In the O. K. case, many other claims are formally in issue, but the brief of counsel for the patents in this court alleges infringement only of claim 12. Many of the claims (including 6) include as an element the check valve which closes the lower or final orifice of this sliding member, the cup. The plaintiff in its commercial Alemite structures, and Lyman and the O. K. in theirs, make no use of any such valve in that location. Such structures all use a check valve at the opening into the sliding cup member; but claim 6 expressly calls for this valve at the discharge orifice of this member; and we agree that it is not infringed by any of the defendants' structures shown.

Claim 12 reads thus: "The connection with a lubricant receptacle of means for supplying the lubricant thereto under pressure, comprising a conduit having means for detachably securing it to said receptacle, a perforated member yieldably mounted in said first named means, for contacting with one end of said receptacle to seal the connection between said conduit and said receptacle, and spring means for yieldingly holding said yieldably mounted means in contact with said receptacle." This claim has evidently been selected for prosecution because in some particulars it is not so broad as some others, and yet is believed to be broad enough to cover the defendants' structures involved. One of the courts below apparently thought that the claim description of the sliding cup element should be restricted to substantially the form of Winkley's sliding cup, having complete sides and top, and having the spring pressure applied from outside. It is plain that this claim and the group of which it is a member intended to eliminate the cup orifice check valve as an

element of the combination and to cover more broadly the remainder of the device as it would operate without any exit valve. There is no reason why, in a proper case, this might not be done, since if this member were not inverted, or if the exit were small enough and the oil heavy enough not to run out, this valve would be only an addition to the structure, commonly useful, but often not necessary.

The defendants' structures undoubtedly respond to this claim, excepting that they have cut away the top and part of the sides of the sliding cup member, so that it slides in the casing more as a piston plunger and is yieldably held to its lowermost position by a spring extending from its bottom up to the top of the casing. One court below thought this not the equivalent of Winkley's cup. Of course, this depends upon the proper scope of equivalency; the language of the claim is amply broad enough to include this mutilated form. Unless for the matters hereafter stated, we see no reason to limit this claim to this extent. Unless for those matters, Winkley did something entirely new when he provided for that compound joint and seal, between the meeting conduit members, which first made positive connecting grip between the permanent parts of the two and then added an intensive seal, provided by contact between the firm surface of the lower member and the yieldably retreating, but downwardly pressing sliding element of the other member, both in a combination which contemplated the passage of the lubricant through the sealed joint so made with the resulting protection against extrusion of the oil.

If this is what he did, Winkley ought not to be restricted to the particular form of his sliding member. The top and sides of his cup are quite clearly of little or no importance to its function. Its closed form prevents the oil from escaping through the sliding fit between cup and casing, but so long as the lower part of the cup is retained and given a tight sliding joint, the same result is maintained. The only other use of the complete form of the cup is that its top makes an abutment for one end of its pressing spring, but this abutment can just as well be anywhere else on the cup, or on its bottom. We must therefore inquire whether the state of the art prevents giving this normal scope of equivalency. In our judgment, most of the matters relied upon for this limiting effect are at once seen to be ineffective when we observe that they sought to use one means only for their complete

union. They do not show a slidably mounted sealing member, wholly independent of and supplemental to the mechanical primary gripping means. The probably meritorious distinction, perhaps alone effecting satisfactory commercial utility, is that no single action quick detachable means can adjust itself, as against mechanical imperfections of construction or wear, to maintain continuously an efficient sealing for a high pressure lubricating device.

An argument, much relied upon, against finding a reasonably broad invention in this novel construction is that Winkley's spring-pressed sliding member is merely a resilient element and that the gasket or washer of the old screw thread unions is an equivalent resilient element. We think not. A stationary packing, crowded against its support by an advancing screw head, makes a tight joint, for the time, and while not disturbed, but when compressed or worn by long or frequent use, the screw must be further advanced, or the joint leaks. With the quick detachable grip of the present form, there can never be any such advancement. The automatic supplementary adjustment which Winkley provided, was necessary to the best effectiveness of the quick detachable grip. Other distinctions also exist. It may be said, as usual in such cases, that the defendants are at liberty to use a screw thread and gasket union. One of the defendants tried to, but gave it up, and adopted the secondary sliding element, giving the automatically adjustable intensive seal.

It is next contended that Winkley is but an aggregation. Counsel seem to mean both that it is an aggregation as distinguished from a true combination and that it is a mere selecting of existing elements and putting them together in a way which, though it may produce a true combination, does not involve invention. Both claims will be considered. It is doubtless true that the compressor, the coupler and the fitting are not always dependent on each other. Each has useful functions not necessarily associated with the others; but the fact that they are not always in combination does not demonstrate mere aggregation when they are used together. The device is for the purpose of forcing lubricant into an interior bearing, and the situation at the moment of use must determine the character of the association of the parts.

[2] It is not necessary that the mutual interaction should be constant; the modification of one element by another during one of the successive steps of the unitary op-

eration is sufficient to make a true combination. Egry Co. v. Standard Co., C. C. A. 6, 267 F. 186, 191. Here we find that as the oil progresses under pressure from the advancing compressor it is received into and through the fitting, which has its valve opened by the pressure, and it passes through the joint between coupler and fitting, which is constantly held together by the opposed clamps and which is sealed by the spring-pressed sliding element. We find no room to doubt the existence of a combination, as distinguished from that aggregation where two elements of the combination are never in use at the same time, like the lead pencil point and eraser tip (Reckendorfer v. Faber, 92 U. S. 347, 23 L. Ed. 719), or where the action of one only indicates but takes no modifying part in producing the action of the other, like the ajutage (Gas Machinery Co. v. United Gas Improvement Co., C. C. A. 6, 228 F. 684, and cases cited).

The question whether Winkley did more than exercise mere mechanical skill in selecting and putting together existing elements is the most serious objection made to this patent; but we do not regard it as fatal. It brings us to the Alley British patent of 1906, and the Barcus United States patent No. 1,-117,762 of 1914. (Piquerez is not old enough to need consideration here.) Alley was for a grease gun for this general purpose. He had the idea that he would substitute for the old grease cup a fitting which would project above the main member and be suitable for engagement with a nozzle at the end of the flexible hose attached to a grease compressor. He did not very clearly disclose, but he apparently contemplated, using identical fittings in place of all his grease cups, whereby the nozzle could be moved from one to another. He made a screw-threaded connection between nozzle and fitting, although he added to the description a general suggestion that a bayonet joint connection might be substituted. His nozzle was without any secondary resilient sealing means for its joint with the fitting; indeed, he did not show even a packing for this purpose; and if he used a high pressure and the screw threads were adapted to quick attachment, extrusion of the grease would be probable.

Barcus was dealing with a coupling for two lengths of water hose, apparently for large hose to be attached to a fire hydrant, because his device is too elaborate for lawn or garden use. This device is the only one before Winkley, found in any somewhat analogous art, in which there was a claiming connection supplemented by anything in the nature of a spring-pressed, tight-sealing, element. In a general way, this element in Barcus resembles that of Winkley and of defendants. Each section of hose carries a coupler head between which heads there is a primary connection of the bayonet joint character. The outer head carries an annular sliding member which is spring-pressed toward the open end and, as the inner coupling member enters the outer head, it meets this spring-pressed sliding member and pushes it back. The spring pressure tends to maintain the proper sealing contact between the two coupler heads. It can well be said that, if some one had told Winkley to put the Barcus sliding member into the nozzle of the Alley hose, the necessary adaptation of parts necessary to produce Winkley's own result would have been within the range of mechanical skill. It is in the conception of the transfer, followed by reduction to practice, that inventive merit is to be found, if anywhere; and we think it is. The transmission of water through a hose coupling where it would have unobstructed flow and where the connection once made remains unbroken during a substantial operation, and where the loss of some of the water at the joint is of little consequence, directly or indirectly, does not present the same problems as the transmission of a small amount of oil through obstructed openings where a perfect seal is of primary rather than of secondary importance. It is true that both use couplings, and in that sense, the arts are analogous, but the conditions surrounding their use are different. The propriety of going to a fire hose to see how to get grease into a fitting is not wholly apparent.

Nor do we think that, even if both structures were observed, the advisability of the transfer of this element would be obvious. The Barcus sliding element is complicated. It consists of a ring or sleeve, sliding in the interior of the outer coupling, and wholly outside the main, unobstructed passage. It carries a cup-shaped washer, for sealing contact with the longitudinal walls, and held in place by a screw ring. The spring which makes it resilient is also wholly outside the main passageway, so as not to obstruct it, and is held against an annular shoulder in the coupler. It does not bear against the top closure of the nozzle, because there is no such closure—indeed, there is no nozzle at all. More than all, claim 12 indicates the change from Barcus open sliding tube to Winkley's "perforated member," with its relatively small central opening, obstructed from the sides to the perforation. There is

no "lubricant receptacle," nor "means for supplying the lubricant thereto."[4] In a fair sense, a new result was produced by Winkley. Of course, it may be said that each (Barcus and Winkley) only passed a fluid element through a joint without leakage; but in the forms by which Winkley adopted this idea, and upon which adoption Gullborg based his development, they produced an unprecedentedly efficient lubricating device, adapted to the particular problems of the automobile and similar uses; and it swept the field.

Defining the phrase broadly enough, it will almost always appear that there was no "new result"; but the "new result" of Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177, was not to make cloth, but to make it faster—increased efficiency. Upon the whole, and applying as best we can the rule in such cases, we think there was invention in taking the sliding element from the water hose coupling of Barcus, modifying it as necessary, and using it in the grease gun nozzle of Alley. Considered as a matter of mere double use, we think the patent sustainable under the discussion of authorities found in our opinion in Weir Frog Co. v. Porter (C. C. A.) 206 F. 670, 675. "The physical change * * * signified transformation of one thing into another." We have sustained as inventive generally similar adaptations of existing old elements to a new utility. Star Brass Works v. General Elec. Co. (C. C. A.) 111 F. 398; Herman v. Youngstown Car Mfg. Co. (C. C. A.) 191 F. 579, 582, 583, and cases cited. We have also found invention in the adaptation, to automobile problems, of formerly known mechanical means. Cadillac Co. v. Austin (C. C. A.) 225 F. 983, 991; American Ball Bearing Co. v. Finch (C. C. A.) 239 F. 885, 889; Inland Mfg. Co. v. American Wood Rim Co. (C. C. A.) 14 F.(2d) 657.

[3] We now come to the Gullborg patent. The relations between Winkley and Gullborg are, in our opinion, those typical between a relatively generic patent and a specific improvement thereon. The improvement has contributed substantially to the public acceptance; perhaps the form shown in the generic patent has never been put upon the market and had some deficiencies which would have interfered with any general use unless perfected by the later patent; whatever inferences for patentable novelty come from commercial success and public acceptance belong to them jointly, because the article marketed traces origin to both; to attempt to apportion the credit is not required nor feasible.

Gullborg's improvement pertained to the form and resulting functions of Winkley's spring-pressed element for completing the seal. In place of Winkley's cup, with top and sides complete, Gullborg substituted a cup-shaped perforated washer, which was spring-pressed into sealing contact with the head of the fitting. The additional functions gained by this change in form were two: The first was that after the initial sealing was effected by the spring pressure, it was intensified and made more efficient by the pressure developed in the liquid itself. The second was that by reason of the peculiar shape of the sliding member, and after it had been by the pressure of the fitting pushed up a substantial distance, upon the disunion of the parts the spring would throw it sharply down to its position of rest, leaving a vacuum behind it, and an upward inrush of air into this vacuum through the restricted opening would create a suction which would pull up into the opening the grease which at the moment of disunion had been below the opening, and which otherwise would smear up the parts and impair the cleanliness of operation.

The first of these meritorious functions is not fanciful. Its existence is not only apparent from inspection, but tests show that the same pressure which is developed in the conduit below the fitting—as much as 1,000 pounds if need be—is also developed above and against the contacting bottom of this cup washer; and the actual efficiency in this pressure is demonstrated by the test showing that, while it is maintained, the fitting head and the lower side of the washer cannot be disturbed in their adherence without considerable force, while, when the pressure is removed, they would, except for the bayonet joint, drop apart. As to the second functional merit, its theoretical existence is apparent. Its actual existence in substantial degree seems to be demonstrated by high-pressure experiments [5] and by the concurrence of the undisputed testimony that the

---

[4] Some of defendants' forms have a perforated gasket, which, considered by itself, is more approximately of Barcus' proportions, but it is in connection with other parts which contract the orifice relatively to the coupler.

[5] Of course, in order to allow this vacuum and suction to develop, any heavy pressure on the grease must be stopped, either by the check valve used in some forms, or by the release of the plunger pressure, or both, and, if there is any failure in this relief, the grease, perhaps after momentary retraction, will continue to exude.

claimed result does occur and that this is one of the efficient causes why the device has had its great success.

Considering only Winkley, we have no doubt of the practical merit in the Gullborg improvements; but after Winkley had shown the way, by adopting Barcus' sealing member to use in a grease gun, the field of invention for subsequent improvements was thereby narrowed. However, it is plain that Gullborg did more than merely adopt the Barcus idea in the environment provided by Winkley.

One of these improvement functions Barcus did not suggest—much less perform. He had no restricted opening of any kind through the bottom of his sliding member. Hence the creation of any vacuum back of it, with the resulting indrawing suction, was impossible. The other improvement function, the added seal from inherent pressure, is found in Barcus. He says nothing about it, as his reference to the lubricant pressure seal plainly refers to the sliding contact upon the sides; but it is this pressure which is exerted, through the interposed washer, to force the inner coupling member down, so that its pins are held in the depression of their corresponding slots. In this respect Gullborg used Barcus' form more closely than Winkley did. Gullborg's specific changes gave more sealing surface between fitting and sliding member than Barcus did; but we see nothing in this, except a change in degree. So far, therefore, as any claim in Gullborg depends upon this suction result, it is valid; so far as it must rest solely for its novelty upon the pressure produced adhesion, it is invalid. Of the claims in suit, Nos. 1, 2, 3, 4, 7, and 8, by their reference to a perforated sliding disc or cup washer, or means for removing excess lubricant, sufficiently imply dependence upon the construction which will give this novel suction effect. In claim 12 there is no novelty over Winkley, excepting that the interposed gasket is held against one of the members by the pressure of the lubricant. This claim, for the reasons just stated, is invalid.

We see no reason for denying the patentable novelty of Gullborg's particular form of fitting, by reason of which it has come to be called a pin fitting, and by which the same pin which furnished bearings for the slot was made to pass through the fitting and furnish an abutment for the valve closing spring; but it is only this complete combination that can be patentable. When the pin becomes merely arms projecting from each side, and the spring abutment is otherwise furnished, we have only the already common bayonet joint member. It follows that claims 14 and 15 are valid.

We see no invalidity in claim 7. It calls for the coupler member, including the perforated cup leather which is its novel characteristic, and in combination with any suitable coupled member leading to the bearing. This subassembly performs by itself a step in the operation and develops the new suction function; and we see no reason why it should not be covered by a claim which includes the associated means only by general terms. Whether there are distinctions which support the independence of each of the claims named, is not practically important.

[4] The Manzel patent in suit in the Lyman Case was by the court below held to be of such narrow scope as not to be infringed. We think a more satisfactory and quite inevitable conclusion is that, without going beyond comparison with the other patents in suit, Manzel discloses nothing patentable. He uses Gullborgs' general construction, save that he makes a loose fit rather than a tight one between the outer and inner members of the bayonet joint coupling, and that the head of the fitting in contact with the sealing gasket is very slightly rounded. It is said that by these changes he avoids danger of breaking the seal if the two parts get out of alignment. We see nothing but ordinary skill—very ordinary—in giving a little play between two parts and in making a part to which a flexible washer is to be applied a bit rounding instead of flat.

We find infringement of claim 12 of the Winkley patent, through the sales by Lyman and the O. K. Company of their several forms of the complete apparatus. This can probably be called direct infringement, although, if it might be thought that there was no infringement until the user coupled the parts together and gave them their joint operation, these same sales would undoubtedly be contributory infringement, not here distinguishable in its effect from the direct kind. The application of various Gullborg claims to the different structures of defendants, as a matter of direct infringement, can be made upon settling the decrees below.

[5] The remaining question raised by the Larkin appeal, and common also to the Lyman and the O. K. Company cases, is called the question of repairs and replacements. It arises because the large part, if not the bulk, of the sales of the manufacturing defendants, has been either of fittings or of compressors alone, and it is said that purchasers of the patent combination from

Winkley and Gullborg have the right to buy repairs and replacement parts from others. The contention has been most elaborately argued and has produced some confusion in results. We cannot see how the record presents any such question. The distinction between the repair or replacement which the purchaser of the patented article may make, and the renewal which he may not make, is not always easy to draw; but there is here no occasion to make the effort. If the owner of an automobile, which has been supplied by the patentee with the fittings and compressor of the patents, finds that either fittings or compressor breaks or develops some operating defect, the question whether new ones could be substituted without the patentee's consent would very likely depend upon whether the old ones had performed their reasonably expected term of service. If the purchaser sells his compressor, or it is lost or stolen, it is hard to see on what principle he has license to make himself a new one; but for the purposes of this opinion it may be assumed that he has. It may also be so assumed that, if a fitting gives out, the owner may replace it with a new one bought from some one else; but there can be no plausible claim that, because the patentees have sanctioned the use of the invention upon 10 bearings of an automobile by furnishing the means therefor, the owner thereby has a license to get the same means for some other source for using the invention upon 20 or 30 more bearings.

Some of the evidence naïvely assumes that the right of "replacement" means the right of installing in the place of the old grease cups; and while the phrase is not by others so misunderstood, we find no evidence that any substantial demand exists for any of these parts, excepting for new and additional installation. The defendants have been selling the parts, especially the fittings, in immense numbers. Sales were made to dealers and to garage men, who sell or install where they please; the defendants cannot control the use made thereafter, if they would. Their notice on the container, "These fittings are to be used only for repair and replacement," is utterly futile; and to suppose that any substantial fraction of these parts is needed for or sold for or used for repairs or replacements would be an unfounded guess contrary to the well known facts. The contention might as well have been urged in the Leeds & Catlin Case, infra. Doubtless occasionally a record broke before it was worn out and the owner might have had the right to replace it.

[6] Such an occasional, possibly rightful replacement by the user would have been as sound a basis for permitting the general manufacture and sale of records there enjoined, as is the occasional instance here of a broken fitting or a defective compressor to support defendants' unlimited manufacture and sale of fittings separately or compressors separately. No doubt, if a patented device which includes a normally and frequently removable element is in general use, not only may the licensed users carry this part in stock for their anticipated necessities, but others may offer it for sale to those who may thus lawfully use. This is not such a case.

[7] The substantial basis, so far as there was any, for a theory which would permit defendants to sell pin fittings, suitable and intended for eventual use in such connection with a compressor that the use would bring about infringement of the patents, was not the right of "repair and replacement" at all, but the alleged right to sell an unpatented article in spite of the infringing use of it which is to be made—an exception to the rule of contributory infringement. Where such article was of a temporary and consumable character, like the paper roll (Morgan Envelope Co. v. Albany Perforated Wrapper Paper Co., 152 U. S. 425, 14 S. Ct. 627, 38 L. Ed. 500; Heyer v. Duplicator, 263 U. S. 100, 44 S. Ct. 31, 68 L. Ed. 189), it might be freely made and sold by others, even though it had been—perhaps improperly—made an element of the claims to the device in which it was consumed. Where the element was not intended to be consumed but was to remain a part of the combination during the expected life of the device, the right to duplicate it was perhaps in dispute.

Then arose the Leeds & Catlin Co. Case, 213 U. S. 301, 29 S. Ct. 495, 53 L. Ed. 805. The claim of the patent covered the combination between the talking machine disc record, having grooves of a peculiar character, and the reproducing stylus and diaphragm mounted in a peculiar manner. Coaction between the peculiar characteristics of each caused the audible sound reproduction. This patent belonged to the Victor Company, and the established practice was to sell the reproducing device without the record. The buyer then or later could separately buy as many records as he wished. The infringement occurred only when the purchaser put the two parts into co-operation and produced the resulting joint effect—just as here. The Leeds & Catlin Company manufactured a reproducing device which did not meet

the terms of the patent claim as to that device, and then marketed in large numbers disc records, ostensibly for use in its own device, whereby there would have been no infringement, but actually for use in connection with the patent apparatus which the Victor Company had sold to the public, whereby infringement would result. Although the record so sold by Leeds & Catlin was an unpatented article, the Supreme Court held that its sale was beyond the rights of its maker and constituted contributory infringement of the patent.

The case is on all fours with the present one. The time may come when compressors which do not respond to the Winkley and Gullborg claims, but which can be used with the plaintiff's fittings, will be upon the market and in use to a considerable extent. When that time comes, the inference that defendants are selling their fittings for use only in the patented combination would be less strong. The question of contributory infringement might then have a different aspect; but at present that contingency is academic. To say that the fittings are intended for such innocent use is to propound the same subterfuge which the Supreme Court looked through as to the disc records.

It is true that in the Leeds & Catlin Case, the court said that the greater part of the inventive merit in the combination was found in the peculiarities of the record disc, while in the present case we find more novelty in the coupler; but there can be no distinction in principle resting on this difference. The fitting here and the disc there alike, independently considered, were unpatented, and probably broadly unpatentable, save in combination with the other associated member; and each alike was vital to the intended action, because neither one was operative without the partner which completed the infringement.

We may assume (for opinion purpose) that the principle of the Leeds & Catlin Case does not extend to a case where a common and previously known article of manufacture had been more or less improperly brought into the combination claim. Not only would there be an existing market for other uses, which would prevent, or tend to prevent, the inference of intended infringement; but it is unnecessary here to consider manufacturing rights in any device of standard form. When defendants put out their pin fittings, nothing resembling them was upon the market excepting the plaintiff's which had come into such general use, as above stated. It was natural that the plug

should have been made of the same external size and thread as plaintiff's, because the grease cup tap holes had been standardized; but in other respects defendants' selection of precise form, size, and shape could have no purpose, except to enable them to be joined with plaintiff's compressors for the practice of the patented invention. The pin fitting is not a mere inert conduit which has nothing to do with the characteristic features of the lubricating operation. It must make precisely the proper coupling with the coupler. It must present a suitable sealing surface. Its closure ball must be held open by the lubricant pressure during the operation and be seated at its end, and this simultaneous seating co-operates with the suction effect in the coupler to prevent drawing grease back out of the fitting.

We conclude that for the car owner or the garage man to buy fittings, and therewith equip additional bearings to be lubricated by the patented combination, is well described by the phrase in the Leeds and Catlin opinion—he "adds to his repertory." This is contributory infringement, and a separate sale of the compressors is an even plainer case.

[8] In the Waggs and Riggs Case the defendants were proprietors of garages or repair shops, and also sold and installed automobile accessories. It appears without question that one of them had purchased from the Lyman Company 2,000 of its fittings, and had sold or used all of them, and that the other had purchased fittings—the number not stated—of the O. K. Company and sold or used many of them. It appeared that each of them, or their employees, knew that these fittings were to be used with the Alemite compressor, or with some equivalent. Contributory infringement is clear in each case. The District Judge thought this infringement so trifling as not to justify injunction. That may be good ground for denying an accounting. We would seldom review the discretion of the District Court in not ordering an accounting in a trifling matter; but it is hardly a safe reason for refusing an injunction. The infringing conduct had not been discontinued before suit brought; the willingness of the defendants to infringe was apparent; their opportunities to do so without being caught would be abundant in the course of the business which they were continuing to carry on. We think an injunction should have issued in each case.

[9] The main defense of these defendants was that they did carry some genuine Ale-

mite parts; that their stocks of fittings had been bought mainly from brokers, who sometimes acquired genuine fittings from manufacturers who had purchased from the Bassick Company; that the patented fittings were not marked, so that these defendants could distinguish the genuine from the copies; that these defendants supposed they were handling the genuine fittings; and that the conduct of the Bassick Company (plaintiff) in putting out unmarked fittings had caused this confusion, and hence that company should not have equitable relief.

The defense, as one of fact, is not very appealing; one of the defendants did not buy from the Alemite distributor, because that price was too high; the other because for two years the authorized distributors had refused to sell to him. Hasty acceptance of the alleged reason for the presence on the market of large quantities of genuine parts at cut prices indicates a willing credulity. This defense is in effect a claim of license, and not only should the defendants plead a license, which was not done here, but they carry the burden of proof to establish it. Maimin v. Union Special Mach. Co. (C. C. A. 3) 187 F. 123, 125. Any equities which the defendants have, resulting from the Bassick Company's failure to identify its own fittings for the information of the trade, will be met by providing in the injunction that it shall not extend to the sale of any parts which defendants purchased, believing that they were genuine Alemite parts, and bought as and for the genuine, and without any reasonable cause to doubt their Alemite origin.

The various decrees appealed from will respectively be reversed or modified in accordance with this opinion, and the cases will be remanded for the entry of new decrees accordingly. The master should be directed to find a reasonable royalty, in order that the court may apply that measure of recovery, if it should finally be thought appropriate. The Bassick Company will recover the costs of this court in all the cases.