## AMERICAN PATENTS DEVELOPMENT CORPORATION et al. v. CARBICE CORPORATION OF AMERICA.*
### No. 27.

Circuit Court of Appeals, Second Circuit.
Feb. 3, 1930.

*Certiorari granted 50 S. Ct. 347, 74 L. Ed. ——.

Charles Neave, of New York City (George C. Dean and Clarence D. Kerr, both of New York City, of counsel), for appellants.

Darby & Darby, of New York City (Samuel E. Darby, Jr., of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge (after stating the facts as above).

The patent in suit relates to the refrigeration of perishable products of a sort not to be damaged by excessive freezing, such, for instance, as ice cream, by packing them around a block of solidified carbon dioxide, and inclosing the whole mass in a box or shipping case. Carbon dioxide ($CO_2$) may exist as a gas, a liquid, or a solid, depending upon the conditions of temperature and pressure to which it is subjected. As a solid it has an excessively low temperature—approximately minus 140 degrees Fahrenheit. When solid carbon dioxide absorbs heat, it sublimes; that is, it evaporates as a gas without passing through the liquid state. This gas is itself very cold, having a temperature of minus 110 degrees. The rate of evaporation is slow, and one volume of the commercial solid carbon dioxide will evolve approximately 500 volumes of gas. These facts were known long before the patentee, Slate, entered the field. Prior patents show machines and processes for producing solid carbon dioxide and molding it into bricks or blocks. They suggest its use as a refrigerant and as a substitute for water ice, but none of them suggests the arrangement of refrigerant and things to be refrigerated which the patentee insists upon.

The prior art had taught that a refrigerant should be so placed as to be more accessible to heat than the products to be refrigerated. In the ordinary ice box, the water ice is placed in a compartment at the top, and the interior of the box is cooled by the circulation of convection currents of air. The accepted practice in shipping ice cream was to pack ice and salt in a container, with the can of ice cream in the center, cooling being effected by conduction. Slate reversed this process. He put the refrigerant in the center of the package, surrounding it with the ice cream or other substance to be refrigerated, and inclosing all in a packing box or insulating wrapping. Thus the foodstuff itself is made to help to insulate the solid carbon dioxide against outside heat. Further insulation is supplied by the constantly evolving gas, which is a poor conductor of heat. The gas, being heavier than air, displaces the air, until all the interstices within the packing box are permeated by the cold gas, which acts also as a refrigerant of those portions of the foodstuff remote from the solid carbon dioxide. The outside container or shipping case may be of any insulating material; in practice a box of wood, or of cardboard or corrugated paper, which may be thrown away, is used. The cake of solid carbon dioxide placed in the center of the package may also be inclosed in a box, or, as appears to be the practice, it may merely be wrapped in paper.

The refrigerant value of solid carbon dioxide is about twice that of water ice; that is, one pound of the former will absorb during evaporation twice as many heat units as will one pound of the latter while melting. But by utilizing the peculiar and well-known properties of solid carbon dioxide, by means of the above-described arrangement of the package, the patentee has made its refrigerating efficiency approximately 15 to 20 times that of a like weight of water ice. The cost of "dry ice" is about 10 times that of water ice; but its high refrigerating efficiency, its capacity to "melt" without becoming a liquid, and the saving in weight, and hence in freight, give transportation packages made up with dry ice advantages which more than offset its greater cost. Packages made up in accordance with the teaching of the patent have been used to an impressive extent. The Dry Ice Corporation began selling solid carbon dioxide commercially in March, 1925. In that year it sold 366,000 pounds. Up to the end of 1927, it had sold nearly 5,000,000 pounds, of which approximately 90 per cent. has been used in transportation packages by the ice cream trade. Prior to the time when plaintiffs began to market solid carbon dioxide, this substance was not manufactured in quantities of any commercial importance. Counsel assert, and we think justly, that plaintiffs have created a new industry.

Slate's original application was filed January 10, 1924. A divisional application, covering one of the specific applications of the invention claimed in the parent application, was filed September 27, 1924. This resulted in the issuance of the patent in suit on August 10, 1926. It is not a patent for a process. Process claims, originally included in the divisional application, were rejected, and the rejection was acquiesced in. As issued, the patent is only for a "refrigerating apparatus," consisting of a combination of elements, all old, but combined, it is urged, in a novel arrangement to produce new and useful results in the art of refrigeration. Claims 2, 3, 4, and 6 are relied upon on this appeal. It will suffice to recite claim 3 as illustrative:

"A transportation package consisting of a vented protective casing of insulating material enclosing a quantity of frozen carbon dioxide sufficient to afford refrigeration for the desired period and a quantity of freezable product in freezing proximity to said carbon dioxide and the gas evaporated therefrom and arranged so that said frozen carbon dioxide is less accessible for exterior heat than said freezable products."

■ We are satisfied that Slate discovered how to make up a package consisting of freezable foodstuffs, solid carbon dioxide, and their enveloping container, in an arrangement not previously known, and producing the new and useful result of making practicable the shipment of such foodstuffs to greater distances than was previously possible. That this discovery would be patentable as a process we cannot seriously doubt. See Yablick v. Protecto Safety Appliance Corp., 21 F. (2d) 885, 887 (C. C. A. 3): "The patentees translated a more or less isolated and hitherto comparatively unimportant fact of chemistry into a useful industry."

It is argued that the process is merely the operation of the peculiar properties of solid carbon dioxide, and that laws of nature may not be patented. Morton v. New York Eye Infirmary (C. C. S. D. N. Y.) 5 Blatchf. 116, Fed. Cas. No. 9865; O'Reilly v. Morse, 15 How. 81, 115, 14 L. Ed. 601. Nevertheless, a method of utilizing by specified physical means the operations of a law of nature is patentable, and this is what Slate taught. He did not, however, claim it as a process; he claimed only the "package" product of his process. So the patent, if sustainable, must fall within the statutory phrase "machine, manufacture or composition of matter." Rev. St. § 4886 (35 USCA § 31). The defendant denies that it is either.

"Manufacture" seems the most apposite. The courts have given it a comprehensive definition. In Johnson v. Johnston, 60 F. 618, 620 (C. C. W. D. Pa.), Acheson, J., said: "The term 'manufacture,' as used in the patent law, has a very comprehensive sense, embracing whatever is made by the art or industry of man, not being a machine, a composition of matter, or a design."

This has frequently been cited with approval, and many courts have sustained patents for constructions which are not ordinarily thought of as a "manufacture." See Riter-Conley Mfg. Co. v. Aiken, 203 F. 699, 703 (C. C. A. 3); Cincinnati Traction Co. v. Pope, 210 F. 443, 446 (C. C. A. 6); International Mausoleum Co. v. Sievert, 213 F. 225, 228 (C. C. A. 6); In re Hadden, 57 App. D. C. 259, 20 F.(2d) 275; American Fruit Growers v. Brogdex Co., 35 F.(2d) 106 (C. C. A. 3). In the case last cited the court sustained a product claim, consisting of a combination of fresh citrus fruit and a small quantity of borax carried by the rind in an amount sufficient to render the fruit resistant to blue mold decay. Of this the court said (page 108, 35 F.(2d): "The complete article is not found in nature and is thus an article of manufacture."

■ In thinking of an article of manufacture, one naturally thinks of a permanent contrivance, which does not operate upon a subject that is part of itself. The mind unconsciously resists the incorporation of that subject into the "manufacture" itself. Here we have something, the foodstuffs, which it is the object of the package to refrigerate and deliver, and which at the same time is one of the elements making up the package, the article of manufacture. But we see no reason why a substance may not play this dual rôle, without invalidating the patented combination. Paraphrasing the language of Mr. Justice McKenna in Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 325, 335, 29 S. Ct. 503, 53 L. Ed. 816, we may say that, if the operative relation of the foodstuffs to the package were merely that of the log to the saw in the mill, wheat to the rollers which grind it, or pins to the machine which produces them—in other words, in no more operative relation than a machine and its product are—the invalidity of the combination would be scarcely questionable. But here the foodstuffs are really a constituent element of the combination package; their arrangement causes them to help insulate the refrigerant from outside heat, thereby retarding its evaporation. They themselves operate upon

another element of the combination, and are not merely a subject operated upon by the article of manufacture. Nor do we see any reason for refusing to say that the package is a "manufacture," because it is intended to have only a temporary life. While it lasts, surely it is a combination of physical elements never put together before, and exceedingly useful. True, it perishes in use; when the solid carbon dioxide has evaporated, the combination no longer exists. But it is not fatal to a patent that the patented device is to be destroyed by its use. Instance the case of a patented torpedo, referred to by way of illustration by Mr. Justice Brown in Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U. S. 425, 434, 14 S. Ct. 627, 38 L. Ed. 500. We think that the "transportation package" may be the subject of a valid patent.

Validity is also attacked upon the ground that the disclosure is insufficient, in that it does not proportion the quantity of solid carbon dioxide to the quantity of product to be refrigerated, or specify detailed rules for making up the package by one attempting to practice the patent. It is true that the size of the package, the duration of the intended transportation, the temperature of the outside air and of the product to be refrigerated, the character of insulation supplied by the container, as well as other factors, no doubt have to be considered to make up the package in the most efficient and economical manner possible. Nevertheless, shippers are evidently able to make up packages sufficiently efficient for practical purposes by utilizing what the patent discloses.

Defendant's expert Churchill testified that he shipped to his niece in Oregon a 60-pound package containing three quarts of ice cream, and that "the ice cream arrived like a block of cement," and only 22 pounds of the solid carbon dioxide had sublimed in the transit. Apparently he used an unnecessarily large quantity of the carbon dioxide, but because the patent cannot be used in the most efficient manner possible without experience does not prove that the disclosure is insufficient. See Franc-Strohmenger & Cowan v. Arthur Siegman, 27 F.(2d) 785 (C. C. A. 2). It disclosed enough to enable Dr. Churchill to make up a "transportation package" of the character described in the patent, and sufficiently efficient to deliver the ice cream in properly refrigerated condition. The patent states the physical arrangement of the elements which make up the claimed combination. While the relative quantities of foodstuffs and dry ice will vary with the size of the package, length of journey, etc., the claimed arrangement of elements remains constant. It is the arrangement which is vital.

As to the attack upon validity, founded upon the assertion of prior knowledge and use, it seems sufficient to say that, while the evidence discloses knowledge of the general properties of solid carbon dioxide, it shows clearly that no one before the patentee had thought of using the foodstuffs as insulation for the carbon dioxide, nor of utilizing the gas generated upon sublimation as additional insulation and also as a refrigerant of the remote portions of the foodstuffs; that is to say, no one had made up a package with the solid carbon dioxide in the center—no one had utilized the known properties of the refrigerant by the specific arrangement discovered by the patentee.

There can be no reasonable doubt about the defendant's complicity in Marchiony's infringement of the patent, which is all one means by contributory infringement. See Individual Drinking Cup Co. v. Errett, 297 F. 733 (C. C. A. 2). Marchiony was a manufacturer of ice cream. He became a purchaser of plaintiffs' dry ice, and thereby obtained a license to use it in making up transportation packages under the patent in suit; but his license did not authorize the combining into the patented arrangement of dry ice purchased from others than plaintiffs. In March, 1927, defendant sold solid carbon dioxide to Marchiony, who used it in the same way as he had used that purchased from the Dry Ice Corporation. In view of defendant's advertisements, and its guaranty to Marchiony that its product would be as satisfactory as plaintiffs', there can be no doubt of defendant's intent to have Marchiony use its product to infringe the patent.

But it is urged, in reliance upon Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U. S. 502, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959, that Marchiony did not infringe; that plaintiffs' attempt to restrict Marchiony in the use of solid carbon dioxide purchased from defendant is an attempt by indirection to extend their patent monopoly to cover an unpatented substance. There is, however, a plain distinction between that case and this. It is brought out in the opinion of Mr. Justice Clarke in the Motion Picture Case itself, at page 514 of 243 U. S., 37 S. Ct. 419, where he is considering the Button Fastener Case (C. C. A.) 77 F. 288, 35 L. R. A. 728, which, he says, originated "the construction of the patent law

which justifies as valid the restriction of patented machines, by notice, to use with unpatented supplies necessary in the operation of them, but which are no part of them''; and again at page 518 of 243 U. S., 37 S. Ct. 421, where he declared the restriction invalid ''because such a film is obviously not any part * * * of the patent in suit.''

It is only unpatented materials which *form no part* of the patented machine which the Supreme Court held the purchaser of the machine may use at will. The solid carbon dioxide forms the most vital part of plaintiffs' patented package. Marchiony might legally use defendant's carbice in any way not covered by the patent in suit, but he could not manufacture the patented package without the plaintiffs' consent, a consent which they withheld, unless the vital ingredient of its manufacture was purchased from them. To extend the doctrine of the Motion Picture Case as defendant contends would completely destroy the monopoly of plaintiffs' patent. See George Close Co. v. Ideal Wrapping Machine Co., 29 F.(2d) 533, 535 (C. C. A. 1): ''What was 'to make,' within the meaning of the patent law before the Motion Picture decision, is 'to make' within the law since that decision.''

It is further urged that one who furnishes a perishable product which is not itself patented cannot as a matter of law infringe a patent for a device which utilizes the perishable product. Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U. S. 425, 14 S. Ct. 627, 38 L. Ed. 500. The patent there involved called for a combination of a roll of paper and a fixture for delivering the paper in sheets of convenient size. The plaintiff sold its fixtures with the understanding that purchasers should use therewith only paper purchased from the plaintiff. The defendant sold rolls of paper of its manufacture to persons who had previously purchased fixtures and paper from the plaintiff, with the knowledge and intent that the paper sold by defendant should be used with such fixtures. The court held that there was no infringement by defendant. At page 432 of 152 U. S., 14 S. Ct. 630, Mr. Justice Brown said:

''The real question in this case is whether, conceding the combination of the oval roll with the fixture to be a valid combination, the sale of one element of such combination, with the intent that it shall

be used with the other element, is an infringement. We are of opinion that it is not. There are doubtless many cases to the effect that the manufacture and sale of a single element of a combination, with intent that it shall be united to the other elements, and so complete the combination, is an infringement. Saxe v. Hammond, Holmes, 456, Fed. Cas. No. 12,411; Wallace v. Holmes, 9 Blatchf. 65, Fed. Cas. No. 17,100; Barnes v. Straus, 9 Blatchf. 553, Fed. Cas. No. 1,022; Schneider v. Pountney [C. C.] 21 F. 399. But we think these cases have no application to one where the element made by the alleged infringer is an article of manufacture perishable in its nature, which it is the object of the mechanism to deliver, and which must be renewed periodically, whenever the device is put to use. Of course, if the product itself is the subject of a valid patent, it would be an infringement of that patent to purchase such product of another than the patentee; but, if the product be unpatentable, it is giving to the patentee of the machine the benefit of a patent upon the product by requiring such product to be bought of him. To repeat an illustration already put: If a log were an element of a patentable mechanism for sawing such log, it would, upon the construction claimed by the plaintiff, require the purchaser of the sawing device to buy his logs of the patentee of the mechanism, or subject himself to a charge of infringement. This exhibits not only the impossibility of this construction of the patent, but the difficulty of treating the paper as an element of the combination at all. In this view, the distinction between repair and reconstruction becomes of no value, since the renewal of the paper is, in a proper sense, neither the one nor the other.''

This case has been much cited and there has arisen considerable doubt as to its precise meaning. Judge Lurton, afterwards elevated to the Supreme Court, discussed it at length in the Button Fastener Case (C. C. A. 6) 77 F. 288, 298, 35 L. R. A. 728. He says that Mr. Justice Brown's assumption, that a combination of the machine for delivering the paper with the paper to be delivered was valid, was by his own argument shown to be unfounded in reason, and that what the court decided was that the sale of the paper fixture with the paper in it contained the implication of a right to renew when the paper was exhausted. This Judge Lurton says is made clear by Mr. Justice Brown's citation of

Wilson v. Simpson, 9 How. 109, 13 L. Ed. 66, in support of the decision.

A somewhat similar view is expressed by Mr. Justice McKenna in Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 325, 335, 29 S. Ct. 503, 506, 53 L. Ed. 816, where he says that, if the operative relation of the paper roll to the mechanism was like that of the log to the saw in the mill (the illustration used by Mr. Justice Brown), then "the invalidity of the combination was hardly questionable." And he added that, besides, it was made a determining circumstance that the paper perished by its use, and was to be periodically renewed "whenever the device was put to use." The "active co-operation" of the disc to produce the patented combination in the Victor Case was contrasted with "the mere passivity of the paper" in the Morgan Envelope Case, and this distinction was made the chief ground of differentiation. In Williams v. Barnes, 234 F. 339, 340 (C. C. A. 7), Judge Mack considered the principles for which the Morgan Envelope Case and the Victor Case respectively stand, and said:

"The test is whether the element, as part of the patent combination, is perishable in its nature, consumed in the use, and necessarily to be replaced in each successive use of the combination. If it is, then, at any rate in the absence of some restriction, the purchaser of the device in which the combination is to be effected for practical use is impliedly licensed to replace the consumable element."

See, also, Judge Denison's comment in Lyman Mfg. Co. v. Bassick Mfg. Co., 18 F. (2d) 29, 37 (C. C. A. 6).

Whether the Morgan Envelope opinion be interpreted as a holding that the combination of fixture and paper roll was not a patentable combination, despite its somewhat perfunctorily asserted assumption to the contrary, or whether it be interpreted as an exception to the rule of contributory infringement, based upon implied license to renew ephemeral and subordinate parts of a patented combination, we do not think it can control the case at bar. The doctrine of implied license to renew perishable and subordinate parts is based upon the purchase from the patentee of enduring and important parts of the patented combination. Heyer v. Duplicator Mfg. Co., 263 U. S. 100, 44 S. Ct. 31, 68 L. Ed. 189; Wilson v. Simpson, 9 How. 109, 13 L. Ed. 66; Williams v. Barnes, 234 F. 339 (C. C. A. 7); Heyer Duplicator Co. v. Ditto, 6 F.(2d) 578 (C. C. A. 7); Lyman Mfg. Co. v. Bassick Mfg. Co. (C. C. A.) 18 F.(2d) 29; Bassick Mfg. Co. v. Ready Auto Supply Co., 22 F.(2d) 331, 340 (D. C. E. D. N. Y.).

In the Morgan Envelope Case the implication arose from the purchase of a dispensing machine intended to deliver a subordinate element, "which must be renewed periodically whenever the device is put to use." Marchiony purchased nothing from the patentee, except the dry ice. When that evaporated in use, he retained nothing acquired from the patentee from which to imply a license to renew or repair the purchased "device." It is true that the shipping box may be an enduring part of the patented package, and perhaps this should be considered as though purchased from the patentee, since its use in the combination was authorized, although purchased from others. But to refill the shipping case with its vital element, the dry ice, would be, not to renew a subordinate part, but to reconstruct the patented package. That Mr. Justice Brown's opinion did not sanction such a reconstruction is clearly implied from his citation of American Cotton Tie Co. v. Simmons, 106 U. S. 89, 1 S. Ct. 52, 27 L. Ed. 79, and his illustration of refilling the shell of a patented torpedo, to which we have already made reference.

If the patent is valid, as we have held it to be, we find no reason to doubt that the defendant was a contributory infringer. Accordingly the decree is reversed, with directions to enter a decree for injunction and accounting in favor of the plaintiffs.