STAMICARBON, N.V., a Corporation,
Plaintiff,

v.

McNALLY–PITTSBURG MANUFAC-
TURING CORPORATION, a
Corporation, Defendant.

Civ. A. No. KC–2399.

United States District Court
D. Kansas.

Feb. 14, 1969.

J. Donald Lysaught, of Stanley, Scho-reder, Weeks, Thomas & Lysaught, Kansas City, Kan., John W. Malley, Carl G. Love, Donald B. Deaver of Cushman, Darby & Cushman, Washington, D. C., for plaintiff.

McAnany, Van Cleave & Phillips, by James J. Lysaught, Kansas City, Kan., Hume, Groen, Clement & Hume, by Russell H. Clark, Chicago, Ill., Keller, Wilbert, Palmer & Bieber, by Paul L. Wilbert, Pittsburg, Kan., Willis H. Taylor, Jr., New York City, for defendant.

## MEMORANDUM OF DECISION FINDINGS OF FACT AND CONCLUSIONS OF LAW

TEMPLAR, District Judge.

This action was instituted in September, 1965, by the plaintiff, in which it complains that a patent originally granted to one Robert Zaborowski on March 6, 1962, and assigned to plaintiff by proper document in the United States Patent Office, had been and was being infringed by defendant.

The patent consists of a flowsheet description of a "process for separating particles of solid material according to specific gravity" in the manner specifically described in the patent.

A problem presented to the mining industry, and in this case, the coal mining industry, demanded consideration of a coal washing and preparation operation which could be used in locations where limited quantities of fresh water exist-

ed, and/or in areas where the pollution or contaminations of public water must be avoided and eliminated.

To accomplish a solution to this problem, the inventors discovered and utilized a combination of elements through a series of steps to make a certain new and useful improvement for process of coal washing and preparation. Application was made for a patent of the process and the Patent Office, on March 6, 1962, granted Letters Patent No. 3,023,893, which is the patent in controversy. Under provisions of 35 U.S.C. § 119, plaintiff has the benefit of the filing date of an application filed in Great Britain on September 2, 1958.

The process and the claims are defined and described in the patent which was received in evidence.

Though the methods of preparing coal for market after it is mined may not be widely understood or appreciated, it is a matter of essential concern to a mine operator because the coal itself must be separated from other materials such as rock and shale before it may be considered as commercially marketable. These undesirable solid materials must be in some manner removed and their separation from the coal is the objective of a coal preparation process as devised by plaintiff's patent.

Separation can be made by hand but because of the great expense involved, an automated system is desirable. Because rock is heavier than coal, a process utilizing specific gravity was developed. A heavy media washing process was devised. The term "heavy media" is a particular term of art used in coal-preparation plants and refers to a system in which very small, finely divided, solid particles are mixed with water to form a sort of muddy suspension or fluid slurry of the particles in the water. Whereas water has a specific gravity of about 1 (specific gravity being the weight per unit volume), a fluid composed of a suspension of heavier solid particles in water will have a higher specific gravity.

In the coal-preparation processes involved in this suit, such a suspension of heavier, finely divided, solid particles in water is called a "heavy medium."

When such a heavy medium suspension is used for coal preparation purposes, it is made up so as to have a particular, pre-determined specific gravity which is in between the specific gravity of the pieces of coal on the one hand, and the pieces of rock on the other hand —coal generally being lighter than the rock or shale particles associated with the coal as it comes from the mine. When such a particular intermediate specific gravity is selected for the heavy media suspensions, the pieces of coal will actually float on the surface of the heavy medium. Because the rock is heavier, however, the pieces of rock or shale will sink.

In such a separation process pieces of coal and rock mixed together as they come from the mine, after they have been first crushed or broken up to a desired size, are dumped into a "tank" or "bath" containing the heavy medium. The coal floats on top of the heavy medium, and the rock sinks. The floating coal particles are then removed from the top of the tank, and the heavier rock or shale pieces which sink are separately removed from the bottom of the tank. The separated coal particles are referred to as the "floats" and the separated rock or shale or "refuse" particles as the "sinks"—these names signifying the floating or sinking characteristics of these different materials.

After the rock and shale are separated in this manner, it is then necessary to further rinse the pieces of material on rinsing and/or sizing screens, in order to wash off or clean off the finely divided particles from the heavy media bath which cling to the pieces of coal and shale. This operation is performed on "floats" and "sinks" rinsing or sizing screens, a screen being a form of a sieve, and serving to permit water and fine particles to pass through to a collecting vessel below the screen while the larger coal and rock particles are carried

off the screen for whatever further processing is desired.

While this "heavy media" technique of preparing coal has many advantages, it is useful only if the cost of preparing the heavy media bath itself is not excessive. The finely divided heavy particles used to form the "heavy media" suspension with the water must, themselves, be economically available, and techniques must be employed for the recovery and re-use of the suspended solid material.

Prior to the Zaborowski invention, one of the most suitable materials selected for use in making the suspension of finely divided particles is an ore called "magnetite" which is a kind of refined iron ore. This "magnetite" material is magnetic or magnetizable and may be attracted to a magnet. Because of this characteristic, magnetite can be recovered from the aqueous suspensions by collecting the material on a magnet and then scraping it off. The recovered magnetite can then be re-introduced into the "heavy media" equipment. In this way, the suspended "magnetite" material can be removed or recovered from the coal and reused thus substantially reducing the cost of the "heavy media" method for preparing or cleaning the coal.

The magnetite material would be lost through its adherence to the rock and coal as they are removed from the heavy media bath—unless the magnetite particles are washed off or rinsed from such surfaces. For this reason rinsing operations are used over the "floats" and "sinks" rinsing and sizing screens after the rock and coal have been separated ·the heavy media baths.

The rinsing operation requires a water supply to the sprays. Such a system of coal preparation may or may not be used according to whether there is available at the coal preparation plant an adequate supply of water for use throughout the process.

The process disclosed and claimed in plaintiff's Zaborowski patent provides for the recirculation of the water used in the plant so that adequate water spray can be delivered through the various water-using operations in the plant—particularly under circumstances where the natural water supply is barely adequate or fluctuates to low levels in dry seasons.

From the record before the Court it demonstrably appears that coal preparation plants, prior to plaintiff's invention, used a process to accomplish separation of the coal from the refuse (rock, shale and dirt) consisting of the following operations:

(a) The coal and rock mixture, as it is delivered from the mine to the plant, is first crushed or broken up to the desired particle size, which will actually be a range of particle sizes from perhaps about ¼-inch across, up to several inches across. The larger particles are known as "coarse coal" and may, for instance, be of a particle size from 1 inch to say about 6 inches. The smaller particles are often designated as "fine coal" and typically will be of a particle size perhaps less than a ¼-inch.

(b) The mixture of coal and rock from the crusher is separated according to size over what are known as "raw coal screens." The coarse fraction which does not pass through the screen is delivered then to the coarse coal preparation plant, and the fine fraction, which passes through the holes of the screen, is delivered to the fine coal preparation plant. The heavy media baths are primarily used for the larger coarse coal fraction.

(c) The coarse coal fraction is then delivered to the heavy media baths, typically called "vessels" or "wash baths" where the "sink and float" operation takes place to separate the coarse coal from the refuse.

(d) The floating coal particles are then removed from the heavy media bath vessels by some sort of a conveyor and delivered to floats rinsing screens, and the coarse rock particles which sink to the bottom of the heavy media vessels are delivered to the

sinks rinsing screens, again by some suitable chain-like conveying device.

(e) The rinsing screens form an important part of the magnetite recovery system, for it is on the rinsing screens that the magnetite particles, which adhere to the coal and the rock or refuse, are washed off. This is accomplished by spraying the coal and rock particles on the screens with water in some form or other—and thus the entire system requires at this stage some considerable quantity of water to be delivered to the spraying heads to wash off the magnetite particles.

(f) There may be more than one rinsing screen used in order to rinse off all of the magnetite particles, with sprays delivered to each of the screens. Of course, the screens may also be so made as to perform some further "sizing" function—that is, the smaller particles in the course coal fraction can be separated from the pieces of coal and rock. This is particularly true for the processing of the coal-containing "floats" fraction, inasmuch as the smaller coal particles are generally delivered to a different customer or market than is the coal of a larger size.

(g) As a result of the just-mentioned spraying operation over the rinsing and/or sizing screens, a dilute water suspension of the magnetite particles is obtained—but the concentration of magnetite in this aqueous suspension is much smaller than is the concentration of magnetite in the "heavy media" used in the wash vessels. The underflow from these screens is thus typically called "dilute medium" to distinguish it from the "heavy medium" used in the wash vessels. Therefore, the next important step in the recovery of magnetite is to remove the magnetite from the "dilute medium."

(h) This is done, and has been conventionally done, prior to the present invention, by collecting all of the "dilute medium" from the various screens to some sort of a large tank, sometimes called a "sump" and delivering it by a suitable pump through a line or pipe to a special device called a "magnetic separator." In the magnetic separator, the magnetizable magnetite particles in the dilute medium are attracted to the magnet and removed therefrom. The magnetite particles then can be physically scraped off and employed to form a water suspension having a magnetite concentration generally at the desired specific gravity levels of the "heavy medium." This heavy medium, regenerated in this manner, can thus be re-introduced into the heavy media wash vessels, and the process of cleaning the coal continues in this fashion. The water suspension which is left after the magnetite particles are removed from the dilute medium in the magnetic separator is frequently called the "magnetic separator tailings" which can be reused in the plant in various ways.

The foregoing is an outline of the method developed by some coal preparation plant designers and builders to fulfill their needs as economically as possible. The problems created by limited water supply on the one hand and the serious need to control pollution remained to be answered.

The parties have stipulated that McNally-Pittsburg designed, constructed and placed into operation the coal washing and coal preparation plant of the Scotia Coal Company at Eolia, Kentucky. The design, construction and placing into operation of said coal washing and coal preparation plant were pursuant to a contract, designated as Contract W-8367-2, which was executed on June 7, 1962, for the coarse coal washing plant and to a contract, designated as Contract W-9182, which was executed on May 4, 1963, for the fine coal washing plant. The coal washing and coal preparation plant including both the coarse coal and fine coal plants were placed into operation together by McNally-Pittsburg Manufacturing Corporation on January 2, 1964.

Defendant contends no infringement has taken place by any acts on its part; denies that the patent was lawfully granted; denies that it is inducing or contributing to infringement by reason of the design, construction and placing in operation of the coal preparation plant at Eolia, Kentucky for the Scotia Coal Company; denies that there are any distinctive differences between the Scotia plant operation and the plants of Badger and Seminole, designed and constructed long before the patent of plaintiff. Defendant alleges affirmatively that the plaintiff's patent is invalid and void because its claims are obvious; that the process is anticipated; that the claims are covered by earlier patents; and that plaintiff is attempting to enlarge a patent monopoly.

At pretrial the Court announced that the following issues of law and fact are to be determined by the Court:

(a) Whether or not McNally-Pittsburg Manufacturing Corporation has infringed, induced and contributed to the infringement of the claims of the patent in suit by its design, construction and placing into operation, the coal washing and coal preparation plant for the Scotia Coal Company, Eolia, Kentucky.

(b) Whether or not Robert Zaborowski is the sole inventor in the U. S. Patent 3,023,893, or, in the alternative, whether or not Robert Zaborowski and Jan N. J. Leeman are joint inventors of U. S. Patent 3,023,893, or whether Jan N. J. Leeman was the sole inventor and not Robert Zaborowski.

(c) Whether or not the claims of the patent in suit No. 3,023,893 are valid or invalid.

(d) Plaintiff's damages, if any, resulting from infringement, if such is found.

Thereafter, the following extensive discovery and trial of the issues took place beginning January 13, 1969, at Kansas City, Kansas. The Court took the case under advisement, received additional requests from the parties, and now must decide the issues submitted.

Initially, it was discovered that a defect existed in the inventorship of the patent in the suit. The plaintiff promptly filed a motion permitted by Title 35, U.S.C. § 256, to correct the named inventorship of the patent here involved.

The defendant brought the matter specifically to the Court's attention with a motion to dismiss (Doc 35). When the motion to dismiss was heard, the Court concluded that it should reserve the ruling on plaintiff's motion for a corrective order under 35 U.S.C. § 256, and on defendant's motion to dismiss until the case could be heard on its merits, at which time the issue would be determined (Doc 41).

Section 256 permits a bona fide mistake in joining a person as inventor or in failing to join a person as an inventor to be corrected.

After considering all the evidence submitted on this issue, the Court is of the opinion that the patent in question was originally issued to Robert Zaborowski as sole inventor through a bona fide mistake because the invention was actually a product of the joint efforts of Zaborowski and Jan N. J. Leeman and entitles Leeman to be named as a joint inventor with Zaborowski, and the patent should be corrected accordingly.

The patent as so corrected is presumed to be valid and the burden is on defendant to prove its invalidity by clear and convincing evidence. Griswold v. Oil Capital Valve Co., 375 F.2d 532 (10 Cir.). At the conclusion of the evidence, counsel for the parties indicated to the Court (Tr. 576) that the following issues remained in the case:

(1) The issue of infringement; the burden of establishing this rested with plaintiff.

(2) Invalidity of the patent, based on three contentions of defendant:

(a) Prior public use in the Badger plant by defendant;

(b) Prior public use in the Seminole plant by defendant;

(c) Defect in inventorship.

Under the statute, 35 U.S.C. § 282, a patent is presumed to be valid and the burden of establishing invalidity of the patent rests with defendant. See Eimco Corp. v. Peterson Filters and Engineering Company, December, 1968, 406 F.2d 431 (10 Cir. ).

The Court has studied the evidence of prior use offered by defendant, including the flowsheet design and operation of the plants it planned for Badger Coal Company at Phillipi, West Virginia, in 1957, and for Seminole Coal Corporation of Lenzburg, Illinois, in 1953, offered by defendant to establish prior use of the invention. An examination of the drawings and evidence offered by defendant supports the plaintiff's contention that if this is to be treated as prior art, nothing relevant is added to the items of prior art cited by the Patent Office during the prosecution of the application which resulted in the issuance of the patent. The Court has previously described in detail the methods used in coal preparation plants before this discovery of plaintiff's assignors to obtain separation of the floats and sinks. The earlier methods described were those substantially embodied in the Badger and the Seminole plants.

■■■ Defendant urges that earlier patents, and particularly the Dreissen Patent No. 2,693,878, dated November 9, 1964, sustain its claim of invalidity, but presumption of validity is strengthened in those cases where developments relied upon to show invalidity because of anticipation were before the Patent Office and were considered by it. The Court must rule that none of the patents dealing with the prior art paralleled the process developed in plaintiff's patent, and that the presumption of validity attaches to it. These processes reached no further discovery in handling the problem dealt with than has been heretofore described by the Court as existing before discovery by Zaborowski and Leeman. Even when old elements are united in such a manner that union accomplishes either a new result or old result in more facile, economical and efficient way, in a particular environment which presented peculiar and difficult problems, it is a combination and patentable. Bewal, Inc. v. Minnesota M & M Co., 292 F.2d 159 (10 Cir.); Eimco v. Peterson, supra.

## INFRINGEMENT

■■■ The Court must hold that the claim of infringement by plaintiff has been sustained by a preponderance of the evidence. A study of the "flowsheet" published in "Coal Age," the coal industry's trade journal, the August 1964 edition, at page 64, which was furnished to Scotia Coal Company by the defendant, compels the conclusion that the Scotia plant was designed in a manner which utilized the process claimed in plaintiff's patent to design and construct this plant. Defendant seeks to avoid the consequences of this by asserting that though this was the original design for Scotia, upon installation its engineers found that the plant could not operate without certain changes it claims to have made, and, therefore, it turned the plant over to Scotia Coal Company in March of 1964. The Court must conclude from the uncontradicted testimony of Leeman that the modifications which defendant claims it made were soon removed because Leeman found on personal inspection made by him of the Scotia plant in July, 1965, that the plant was being operated substantially in accordance with "Coal Age" flowsheet. The additional connections claimed by defendant were not found by Leeman. Defendant insists that it is not responsible for any modifications made in the system after the plant was turned over to Scotia Company by it. But even though the defendant added the plumbing, as it claims, it cannot avoid provisions of law for the protection afforded plaintiff's patent by making colorable differences without substance, or substitutions which add nothing. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Bewal, Inc. v. Minnesota M & M, supra; and Eimco v. Peterson, supra. The answer to defendant's claim that as designed in the

"Coal Age" drawing, the plant would not work, is simply that the uncontradicted testimony discloses that it was working in July, 1965.

The genuineness of the so-called "Coal Age" flowsheet is not questioned. That it was furnished by defendant to Scotia is admitted. Written notice to defendant of the claimed infringements were given by plaintiff to defendant under provisions of 35 U.S.C. § 287, by letter dated April 8, 1965, and defendant takes the position that there has been no infringement of plaintiff's patent by it and has taken no action to change or modify the continuing infringement at the Scotia plant.

Defendant makes a further contention that after it turned over to Scotia Coal Company the operation and possession of the plant designed and constructed by defendant, its responsibility ended and any mode of operation adopted after that by Scotia is not a responsibility of defendant but of Scotia. Scotia was not made a party to this action. Plaintiff answers this contention by pointing out that in its answer defendant admits the description of the Scotia plant appeared in the "Coal Age" magazine for August, 1964; that defendant admits receipt by its counsel of the letter dated April 8, 1965; and that defendant's response was a denial of infringement of the patent which it designed, constructed and placed in operation for Scotia.

■■ The defendant cannot be permitted to escape responsibility by claiming that its customer Scotia removed the modifications made by defendant in the plant it had installed in such a manner as to infringe plaintiff's patent. Contributory infringement will result from the furnishing of plans of an infringing device or from designing and helping to build an infringing machine as defendant did here. See Trent v. Risdon Iron & Locomotive Works, 9 Cir., 102 F. 635 and Conmar Products Corp. v. Tibony, D.C., 63 F.Supp. 372.

Under the circumstances established by the record in this case, the provisions of 35 U.S.C. § 271 seems clearly applicable. It provides in substance that whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent, infringes the patent, and whoever actively induces infringement of a patent shall be liable as an infringer. And so an act of infringement is one who actively induces infringement of a patent. Scaramucci v. FMC Corp., 258 F.Supp. 598 (W.D.Okla.1966).

> "Contributory infringement is the intentional aiding of one person by another in the unlawful making or selling or using of a patented invention; and a contributory infringer is a person who induces, aids, or contributes to wrongful acts of another which constitute infringement of a patent." 69 C.J.S. Patents, § 305, p. 882.

Only complicity in the infringement is required. American Patents Development Corp. v. Carbice Corp. of America, 2 Cir., 38 F.2d 62.

## FINDINGS OF FACT
## and
## CONCLUSIONS OF LAW

The Court having fully considered the evidence, the briefs and the arguments of counsel, and upon being fully advised in the premises, now finds the following:

## FINDINGS OF FACT

I. This is an action for patent infringement under the Patent Laws of the United States and this Court has jurisdiction pursuant to Title 28 U.S.C. Section 1338(a) and Section 1400(b).

II. Plaintiff Stamicarbon, N.V., is a limited liability company incorporated in accordance with the laws of the Kingdom of The Netherlands, having its registered office at 2, van der Maesenstraat, Heerlen, The Netherlands. Defendant McNally-Pittsburg Manufacturing Corporation is a corporation organized and existing under the laws of the State of Kansas and has its principal office and

place of business in Pittsburg, Kansas, within the jurisdiction of this Court.

III. The complaint was filed on September 27, 1965, charging the defendant with infringement of United States Letters Patent No. 3,023,893, granted March 16, 1962, to Zaborowski for "Process for Separating Particles of Solid Material According to Specific Gravity." Defendant's Answer denies infringement and contends the patent in suit is invalid over a number of prior art patents and further contends that the patent in suit is invalid in view of certain prior public uses designed, engineered and installed by the defendant and which were first operated many years prior to the earliest date of invention by Zaborowski.

IV. The Zaborowski patent here in suit was based on an application filed in the United States Patent Office on August 26, 1959 claiming priority from a prior application filed in Great Britain on September 2, 1958. The United States Patent issued to the plaintiff pursuant to an assignment and the said plaintiff owns all right and title in and to the patent and invention.

V. Robert Zaborowski, the named inventor of the patent in suit, was, prior to and at the time the application was filed in the United States, President of Roberts & Schaefer Company, and he executed on October 30, 1959, an assignment of his entire right, title and interest in his invention to the plaintiff, Stamicarbon.

VI. During Zaborowski's term as President of Roberts & Schaefer Company, Raymond Wagner held the position as Assistant to the President-Engineering, and was under the direct supervision of and reported to Zaborowski.

VII. By letter dated August 8, 1958, Wagner (1) transmitted to the plaintiff two copies of a drawing identified as No. 5813-L3 which represented, at the time of sending, a coal preparation plant as it would be constituted for the Bell and Zoller Coal Company, the plant having been designed and engineered by Roberts & Schaefer Company under Zaborowski's supervision and (2) invited the plaintiff's comments on the engineering merit of the proposed plant.

VIII. Drawing No. 5813-L3 did show some but not all details of the piping layout which would include a network of conduits connecting a fine coal recovery plant to a coarse coal recovery installation, and the piping delivering rinsing water for the clean coarse coal and refuse screen from the classified settling cone of the fine coal washing system.

However, Drawing No. 5813-L3, Ex. 51, does show recycle of substantially all of the dilute medium (which is obtained when the separated coarse coal and coarse refuse fractions are sprayed to rinse off the magnetite suspension adhering thereto when the same is withdrawn from the heavy media bath) directly to the magnetic separator. This type of recycle is not shown in the prior art relied on by the defendant, and unlike this operation conceived by Zaborowski and embodied in the patent in suit, defendant's prior Badger and Seminole plants specifically recirculated as much or about one-half of the dilute medium for use as the spraying agent for rinsing the magnetite suspension from these separated coarse coal and refuse fractions. Using a dilute medium as the rinsing spray is a disadvantageous procedure which defendant did not follow in designing the accused Scotia plant.

IX. Mr. Jan N. J. Leeman, an engineer for the plaintiff, in cooperation with Roberts & Schaefer, on receipt of Drawing 5813-L3 made an evaluation of the plant represented therein and directed Heinrich J. Mengelers, an employee of the plaintiff (1) to prepare a revised drawing, identified as Drawing 3PC3726, and (2) to advise Roberts & Schaefer by letter dated August 30, 1958, of his, Leeman's, proposals for the plant represented in Drawing No. 5813-L3 which proposals were embodied in Drawing 3CP3726. At least one of said proposals was the incorporation into Drawing No. 5813-L3 of further details of the system wherein rinsing waters for the clean coal and refuse would be

taken from the overflow waters from the settling cone of the jig system employed in the fine coal recovery plant.

X. In an Inter-Office Memorandum, dated September 15, 1958, Raymond Wagner acknowledged to L. E. Pritchard, an employee of Roberts & Schaefer, receipt of the plaintiff's Drawing 3CP3726 and communicated to Pritchard his evaluation of Leeman's proposals, rejecting some while approving the use of settling cone water for rinsing clean coal and refuse in the coarse coal recovery plant, instead of fresh water.

XI. During the period of development of the invention disclosed and claimed in the patent in suit, personnel from the plaintiff visited the offices of Roberts & Schaefer and conferred with Zaborowski and those under his supervision concerning heavy media systems for coal preparation plants, and, specifically, the coal plant being designed and engineered for the Bell and Zoller Coal Company.

XII. On September 2, 1958, the plaintiff filed in Great Britain a provisional specification, accorded No. 28210, in the name of John Edward Nash, as agent for the plaintiff and thereafter by letter dated July 4, 1959, advised Roberts & Schaefer of such filing, indicating that the said British provisional specification was based on the coal preparation plant for the Bell and Zoller Coal Company as represented in Robert & Schaefer's Drawing 5813–L3 of July 3, 1958, and plaintiff's Drawing 3CP3726 of August 20, 1958. Plaintiff also requested that it be advised, if Roberts & Schaefer deemed it appropriate, of the identity of any of Roberts & Schaefer personnel who should be mentioned as inventor or co-inventor on the application which the plaintiff proposed to have filed in the United States based on the British provisional specification.

XIII. In reply to the plaintiff's letter of July 4, 1959, Zaborowski in a letter dated July 31, 1959, suggested that Stamicarbon use his name as inventor while acknowledging that the patent application was based, in part, on the Bell and Zoller Coal Company flowsheet 5813–L3.

XIV. On August 25, 1959, Zaborowski executed the Oath, Power of Attorney and Petition for the application which ultimately matured into the patent in suit.

XV. The Zaborowski patent in suit relates to a process for separating particles of solid materials, as for example coal, into fractions according to the specific gravity. The coarser particles in the case of coal are separated by means of a separating suspension of magnetizable particles. The finer particles such as the small coal particles and fine coal dust are separated by means of a liquid of lower specific gravity.

XVI. The Zaborowski patent does not contain any claims to apparatus. Each of its three claims is directed to a process. Claims 2 and 3 are appended to claim 1.

THE CLAIMS IN ISSUE

XVII. The claims in issue are as follows:

"1. A process for separating particles of solid materials into fractions according to specific gravity, which comprises screening the particles to be separated into a coarse fraction and a fine fraction, separating the coarse fraction by means of a separating suspension of magnetizable particles and separating the finer fraction by means of a liquid of lower specific gravity than the specific gravity of said separating suspension, rinsing the separated coarse particles on rinsing screens to remove adhering magnetizable particles, supplying the diluted fraction obtained as a result of such rinsing to a magnetic separator, returning the magnetic fraction obtained from said magnetic separator to the separating means for the coarse material, supplying the nonmagnetic fraction obtained from said magnetic separator to the separating means for the finer fraction, dewatering the separated finer fractions, and feeding water obtained from said dewatering

step at least in part to the sprayers above the rinsing screens for the coarser separated fraction.

"2. A process according to claim 1, in which the non-magnetic fraction obtained from the magnetic separator is supplied to the classifying step in which the raw material is separated into a coarse and a fine fraction.

"3. A process according to claim 1, wherein the feeding water obtained from said dewatering step is also fed to the separating means for the finer separated fraction."

XVIII. The specification of the patent in suit describes raw coal as entering the system at A, at which point water from the sprays 2 washes the fine material from the raw coal. The wash water with the fine coal particles in suspension is delivered to a jig 4 which in combination with parts 6 and 8 form a dewatering step, that is a separation of the fines from the water. Part of the water is pumped by 9 through conduit 14 to the sprayers 13 and 17 above the rinsing screens for the coarser separated fractions. Part of the water goes through conduit 28 to the heavy media bath 11. By means of the conduit 10 some of this water from the dewatering step is returned to the jig 4 (Claim 3).

THE ISSUE OF INFRINGEMENT

XIX. The Complaint charges infringement by reason of Defendant's design, engineering and installation of a coal preparation plant for Scotia Coal Company at Eolia, Kentucky as disclosed in the magazine "Coal Age," August, 1964, Exhibit B attached to the Complaint.

XX. The defendant, McNally-Pittsburg entered into contracts for the design, construction and placing into operation of the coal washing and preparation plant at Eolia, Kentucky, for the Scotia Coal Company and these contracts were completed and the plant, including both the coarse coal washing facilities and the fine coal washing facilities were placed into operation by McNally-Pittsburg on January 2, 1964.

XXI. A flow diagram representing the operation of the Scotia Coal Company appeared in the August, 1964 edition of "Coal Age" at page 66.

XXII. A flow diagram representing the operation of the Scotia Coal Company was provided the plaintiff by the defendant and labeled "FW–9182 Sheet A–1" Scotia Coal Company on January 11, 1966.

XXIII. Three changes, incorporated into the flow diagram identified in Finding of Fact XXII, from the flow diagram identified in Finding of Fact XXI include (a) a recycle of a portion of the thickener overflow water to the raw coal screens; (b) delivery of a portion of magnetic separator tailings water to floats rinsing screens; and (c) discontinuance of delivery of a portion of the thickener overflow water to floats rinsing screens. These changes were completed during the last three weekends of February, 1964.

XXIV. In the operation of the Scotia Coal Company plant, as represented by flowsheet FW–9182 Sheet A–1, raw coal is screened on Ripl-Flo Raw Coal Screens (15) and separated into a coarse fraction (6″ x 1¼″ x ¼″ raw coal particles) and a fine fraction (¼″ x 0 raw coal particles).

XXV. The coarse fraction is fed to McPitt 7′–0″ wide Low-Flow Baths which contain a separating suspension of magnetizable particles whereby the coarse fraction is separated into a sinks fraction and a floats fraction.

XXVI. The finer fraction is fed to a system of separating devices including diester tables, screens and flotation cells and a source of a liquid of lower specific gravity than the specific gravity of the separating suspension identified in Finding of Fact XXVI whereby the finer fraction is separated into a refuse fraction and a clean fine coal fraction.

XXVII. The separated coarse fraction, identified in Finding of Fact XXV, is rinsed on rinsing screen devices (23, 24, and 27, 28) to remove adhering magnetizable particles.

XXVIII. The diluted fraction obtained as a result of the rinsing identified in Finding of Fact XXVI, and represented on FW–9182 Sheet A–1 by the line marked "1180g," is supplied to a 3–30′ X 60″ magnetic separator unit (44) via Dilute Medium Recir'l & Storage Sump and Pump (42, 43).

XXIX. The magnetic fraction represented by the line marked "40g" obtained from the magnetic separator identified in Finding of Fact XXVIII is returned to the separating means for the coarse fraction identified in Finding of Fact XXV via Medium Storage Sump (46).

XXX. A portion of the non-magnetic fraction, represented by the line marked "1205g," obtained from the magnetic separator unit (44) identified in Finding of Fact XXVIII is supplied to the separating means for the finer fraction identified in Finding of Fact XXVI via the line marked "1145g" and 2–6′ x 16′ A. C. DD Low-Ho Pre-Wet Screens (17).

XXXI. The separated finer fractions identified in Finding of Fact XXVI is dewatered by disc filters (56, 114, 128) and the water resulting therefrom reports to Dorr-Oliver 75′ Thickener (54).

XXXII. The water represented by the line marked "2580g" obtained from the dewatering step identified in Finding of Fact XXXI, and withdrawn from the said Dorr-Oliver thickener is fed at least in part, via line leading to rinsing screens identified in Finding of Fact XXVII, to the sprayers above the said rinsing screens for the coarser separated fraction.

XXXIII. The water, represented by the line marked "1120g" obtained from the dewatering step identified in Finding of Fact XXXI, and which is a portion of the water represented by the line marked "2580g" identified in Finding of Fact XXXII, is also fed to the separating means for the finer separated fraction identified in Finding of Fact XXVI.

XXXIV. The evidence is convincing that the operation of the coal washing and preparation plant for the Scotia Coal Company according either to the "Coal Age" flowsheet or to the amended flowsheet, defendant's Exhibits E and H, utilizes the combination of steps set forth in the claims of the patent in suit.

XXXV. The defendant offered no evidence that the Scotia Coal Plant when initially operated by the defendant on January 2, 1964, operated in material respects in any manner other than shown in the flow diagram appearing in the "Coal Age" magazine, and defendant has not contended that such did not infringe the claims of the patent in suit.

Furthermore, while some changes may have been made to the Scotia plant, after having been placed into operation on January 2, 1964, and during a period up to about the latter part of March, 1964, the defendant does not presently know how the Scotia plant was operated after March, 1964. The last visit by defendant's representatives was only a courtesy call by Mr. Edward L. Cartwright, Chief Engineer of defendant's Wellston, Ohio office, in April, 1965. Plaintiff's witness Leeman testified, however, that at least in July, 1965, he personally inspected the Scotia plant and found that it operated in all material respects in accordance with the "Coal Age" flowsheet, especially with respect to the recycle and use of thickener overflow water on the coarse coal (floats) and refuse (sinks) rinsing screens, and defendant has offered no evidence to support a conclusion that the Scotia plant continued to operate according to the changes allegedly made between January and March, 1964, or that it operated in this alleged revised manner at any time after March, 1964. Assuming the changes of January to March of 1964 were once made, the evidence is unchallenged that Scotia had returned to the original "Coal Age" flowsheet scheme prepared by defendant at least as to all material respects by July of 1965.

XXXVI. In the Scotia plant fresh water is added to the circuit in advance of the Thickener overflow sump (60). The Zaborowski patent does not show

any fresh water entering the circuit but requires some make-up water to make it commercially operable.

## VALIDITY OF PATENT

XXXVII. None of the prior art is better or more relevant to the invention of the patent in suit than the prior art cited by the Patent Office during the prosecution of the application which matured into the patent in suit. None of the prior art teaches, suggests or renders obvious the combination of steps which define the invention as claimed in the patent in suit.

Patents considered by the Patent Office before the issuance of said patent in suit included those the defendant claims to rely upon. The Fontein patent, 2,860,782, and the Dreissen patent, 2,693,878, per the Pretrial Order dated May 24, 1968. No significant teaching in these patents, as it pertains to the invention as claimed in the patent in suit, was overlooked or not appreciated by the Patent Office in the prosecution of the application before issuance of the patent in suit.

XXXVIII. During the trial, the defendant offered no evidence to support its contention that the Fontein patent 2,860,782, in any way anticipated or rendered obvious the claims of the patent in suit. Nor did the defendant offer any clear and convincing evidence that the United States Patent Office had not fully considered the Dreissen patent 2,693,878 when it granted to Zaborowski the patent here in suit.

The claims in the patent in suit define novel subject matter over the aforesaid patents.

XXXIX. In addition to the foregoing, two coal washing and preparation plants were relied upon by the defendant as prior art. The first of these was the coal washing and preparation plant, designed, constructed and placed into operation by the defendant for the Seminole Coal Corporation at Lenzburg, Illinois. The second of these was the coal washing and preparation plant, designed, constructed and placed into operation by the defendant for the Badger Coal Company at Phillipi, West Virginia.

XL. The defendant's witness Pate testified that the operation of the Seminole plant followed the same principles disclosed in the Dreissen patent 2,693,878. Accordingly, the operation of the Seminole plant is no more relevant to the issue of patentability and validity than was the Dreissen patent which had been fully considered by the United States Patent Office Examiner before granting plaintiff's patent in suit.

XLI. The Seminole plant, as illustrated in for instance defendant's Exhibit 1, does not operate according to what is conventionally considered a closed circuit water system, unlike the operation described and claimed in the patent in suit. Defendant's witness Pate admitted that his testimony that Seminole operated a "closed circuit" was based on the theory that, indeed, the whole world constitutes a "closed circuit." The testimony of Mr. Cartwright and defendant's own drawings, for instance the "Legends" thereof, showed that this industry conventionally draws a sharp distinction between "fresh water" and "recirculated water," and distinguishes a closed circuit operation using water processed wholly within the plant from "sludge pond" operations where contaminated or dirty water is withdrawn from the plant and delivered to large open sludge ponds, etc.

XLII. Defendant's witnesses were also completely inconsistent with each other regarding defendant's attempt to equate sludge or settling ponds, as used in defendant's Seminole plant, with the settling cones or thickeners as are used in both the patent in suit and in the accused infringing plant for the Scotia Coal Company. For instance, witness Cartwright testified that the very purpose of a settling cone or thickener was to achieve a process which would substantially eliminate the need for a settling or sludge pond to produce clarified water and to provide a "more modern" plant. The weight of the evidence

is persuasive that the prior plants operating with outside sludge ponds to recover waste water delivered from the fine coal plant do not utilize or anticipate the closed circuit system of the patent in suit wherein a settling cone or thickener is employed within the plant to recycle clarified water directly to the coarse coal side of the plant.

XLIII. Defendant attempted to describe the Seminole plant as a "criss-cross" system of operation, i. e., one in which there exists a cross-connection providing a flow of the water from the fine coal plant back to the coarse coal side of the plant as in the patent in suit and thereby tried to identify the Seminole operation with the patent in suit. However, use of the "criss-cross" terminology to describe Seminole's operation, wherein the water and fine solids from the fine coal plant were in fact removed and delivered to an outside sludge or settling pond, for admixture with fresh water before any possible reuse thereof in the coarse coal plant, (see the red line additions on defendant's Exhibit I) was rejected by defendant's own witness Levi who admitted on cross-examination that the term "criss-cross" would be "pretty much a misnomer" if applied to the Seminole plant.

XLIV. The "red line" addition to the Badger drawing, defendant's Exhibits L and M, never existed, in fact, contrary to the testimony of certain of the defendant's witnesses, who had never viewed the operation of the Badger plant. Defendant's witness Cartwright, who had supervised the construction of and the placing into operation of the Badger plant, and was the only witness who had seen the plant, admitted on cross-examination that the red line addition would not be a simple plumbing connection. To the contrary, such an addition would deleteriously upset the water balance in the system, diminish the efficiency of the fine coal and refuse separation in the jig washer, hamper the efficiency of the cyclone operation in the fine coal treatment plant and then the plant would not then work without

reengineering the plant equipment and/or by adding additional fresh water flows to compensate for the hypothetical "red line" addition.

XLV. The weight of the evidence is persuasive that minimizing or reducing the amount of fresh water required for operation of a coal preparation plant, irrespective of the amount of fresh water available at a plant site was desirable, such reduction in fresh water requirements being one of the purposes and achievements of the invention claimed in the patent in suit. Reducing the fresh water requirements minimizes the amount of water which must be clarified or cleaned up, as is required to prevent stream and river pollution which is one of the "problems" of coal preparation plants. The importance of reducing fresh water requirements is indicated by defendant's past disadvantageous use of recycled dilute medium for the rinsing sprays.

XLVI. None of these drawings, if treated as prior art, adds anything more relevant to the invention of the patent in suit than the prior art cited by the Patent Office in the prosecution of the application which matured into the patent in suit.

XLVII. Even though defendant offered no evidence that its original flowsheet and the equipment it installed for Scotia was not specifically designed so as to operate in a manner infringing the patent in suit, nonetheless subsequent to full notification by plaintiff of the infringement of the patent by this scheme defendant did "nothing" to insure that its customer the Scotia Coal Company would not operate the plant according to this infringing method. Defendant thereby gave its customer all that was necessary and needed, in equipment and know-how, to enable and induce it to infringe plaintiff's patent.

XLVIII. None of the prior art relied on by the defendant embodies the system of the patent in suit wherein dilute medium is not used as a rinsing spray agent to remove magnetite from the sep-

arated coarse coal fraction and the separated coarse refuse fraction and wherein water is recovered from the finer coal side of the plant, clarified and recirculated directly back to the coarse coal side of the plant.

XLIX. The contributions of Zaborowski and Leeman respectively shown in plaintiff's Exhibit 51 (drawing No. 5813–L3) and plaintiff's Exhibit 54 (Drawing No. 3–CP–3726) are embodied in the patent in suit and the invention of the patent is the joint work of both Zaborowski and Leeman as joint inventors.

L. The omission of Mr. Leeman's name as a co-inventor and co-applicant was an error without deceptive intent and this Court finds Mr. Leeman should be named as a co-inventor.

From the foregoing facts, the Court concludes:

## CONCLUSIONS OF LAW

I. This Court has jurisdiction (1) of the parties hereto and of the subject matter of the causes of action put in issue by the pleadings by virtue of 28 U. S.C. § 1338 and § 1400(b), and (2) to correct the inventorship of the patent in suit pursuant to 35 U.S.C. § 256.

II. The plaintiff is the owner of the Zaborowski patent and has the right of action for infringement thereof.

III. United States Letters Patent No. 3,023,893 was, through a bona fide mistake, issued on March 6, 1962, to Robert Zaborowski as sole inventor. The evidence herein supports a finding that Jan N. J. Leeman's joint effort with Zaborowski in producing the invention claimed in U. S. Patent No. 3,023,893 entitles Leeman to be named as a joint inventor with Zaborowski and the patent should be corrected pursuant to Title 35 U.S.C. § 256 which provides for the addition of a joint inventor omitted by error.

IV. A patent is presumed valid under 35 U.S.C. § 282 and to overcome this presumption of validity, the proofs must be such as to prove invalidity by clear and convincing evidence.

V. The presumption of validity is strengthened where the alleged invalidity is based upon patents which were before the Patent Office and were rejected as anticipation of invention.

VI. The invention described and claimed in United States Letters Patent No. 3,023,893 has utility, is novel under 35 U.S.C. § 102, and is nonobvious within the meaning of 35 U.S.C. § 103.

VII. All claims of United States Letters Patent No. 3,023,893 are good and valid.

VIII. The claims of United States Letters Patent No. 3,023,893 have been infringed by McNally-Pittsburg through its construction and placing into operation the coal washing and preparation plant for the Scotia Coal Company at Eolia, Kentucky.

IX. Inducing infringement is the knowing, aiding or abetting another to infringe a patent. Defendant's acts of designing, constructing and providing its customers with a coal-preparation plant specifically designed so as to operate according to the process which is claimed in plaintiff's patent, coupled with defendant's complete failure to take any steps to insure future alteration of the operation of the plant so as not to infringe, after defendant had full knowledge of the patent in suit, constitutes active inducement of infringement of the patent in suit under 35 U.S.C. § 271(b). Defendant is thereby liable as an infringer.

X. Plaintiff Stamicarbon, N.V. is entitled to a permanent injunction against any future infringement by inducement or otherwise by defendant McNally-Pittsburg Manufacturing Corporation of the claims of United States Letters Patent 3,023,893.

XI. Plaintiff Stamicarbon, N.V., is entitled to an award of damages under 35 U.S.C. § 284 to compensate it for defendant's infringing acts.

XII. Any finding of fact contained in the conclusions of law and any conclu-

sions of law contained in the findings of fact shall be considered as if they had been included under their appropriate heading.

The Court reserves for further consideration the award of damages, if any, to which plaintiff is entitled. In the event the parties cannot by negotiation settle this item, then the Court will, on request, hear the evidence and determine this issue, or will, if necessary, appoint a Master to take the evidence and submit his recommendations to the Court.

Counsel for plaintiff will prepare, circulate and submit for filing, an appropriate Journal Entry consistent with the Conclusions here announced.